UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **OGLALA SIOUX TRIBE** | ) |
| | ) |
| PLAINTIFF, | ) |
| | )  Civil Action No. 15-_____ |
| v. | ) |
| | ) |
| SYLVIA BURWELL, et al. | ) **PLAINTIFF'S STATEMENT OF** |
| | ) **POINTS OF LAW AND** |
| | ) **AUTHORITIES IN SUPPORT OF** |
| | ) **MOTION FOR** |
| | ) **TEMPORARY RESTRAINING** |
| | ) **ORDER AND MOTION FOR** |
| | ) **A PRELIMINARY INJUNCTION** |
| DEFENDANTS. | ) |

## I.   Introduction and Background

Plaintiff Oglala Sioux Tribe ("Tribe") seeks a temporary restraining order restraining Defendants, and a preliminary injunction enjoining them, from using third party revenues collected by the Pine Ridge Service Unit, which serves the Tribe and its members, from being used to fund a settlement of overtime claims, as planned by Defendants.

On May 22, 2015, IHS Acting Director McSwain sent a "Dear Tribal Leader" letter to Indian tribal leaders. (Exh. A). The letter informed tribal leaders of a settlement that the IHS had reached with employee unions concerning overtime compensation. The letter stated that the settlement payments would be paid using various sources of funding, including approximately 50 to 51 million dollars from prior year third party health insurance collections. *Id.* at 2.

On July 29, 2015, IHS Acting Director McSwain sent a second "Dear Tribal Leader" letter to Indian tribal leaders concerning the settlement. (Exh. B) This letter confirmed that the Judgment Fund, available to pay judgments against the United States, and compromise

1

settlements (31 U.S.C. §1304(a)), would not be used to make the settlement payments. Exh. B at 1. The letter stated that service unit third party collections would be used to make the payments for fiscal years 2005 through 2014. *Id.* These funds are mainly Medicaid and Medicare collections.[1]

The July 29, 2015 Dear Tribal Leader letter stated that IHS had made an initial estimate of the amounts that would be owed by each service unit, for purposes of making a $60 million payment due to the union, which payment it said is due on August 14, 2015. Exh. B at 2. It stated that Acting Director McSwain had directed IHS Area Directors to make available to tribal leaders the impact on their service units. *Id.*

The Tribe has been advised by IHS officials that $1,655,658 will be taken from their service unit, including $1,346,976 from the Pine Ridge Hospital, and lesser amounts from the Kyle and Wanblee clinics ($210,465 and $98,217, respectively). (Exh. C at 2-3). According to Pine Ridge Hospital officials, if these amounts are actually taken from the service unit, direct patient care will be impacted dramatically, services will be reduced, and there will be difficulty in maintaining Medicare and Medicaid accreditation with the Centers for Medicare and Medicaid Services ("CMS"). (*Id.* at 2) (email from Patrick Weber, Acting Clinical Director, Pine Ridge Hospital); *id.* at 3 (email from Sophia Conroy, Acting CEO, Pine Ridge Hospital).

## II.   **The Tribe is Entitled to a Temporary Restraining Order**

In determining when a temporary restraining order and preliminary injunction is appropriate, the court "must consider whether:  (1) the party seeking the injunction has a substantial likelihood of success on the merits; (2) the party seeking the injunction will be

---

[1] Medicaid and Medicare together account for 89% of IHS third-party collections. Cristina Boccuti, et. al., *The Role of Medicare and the Indian Health Service for American Indians and Alaska Natives: Health, Access and Coverage*, Kaiser Family Foundation (Dec. 18, 2014), http://kff.org/report-section/the-role-of-medicare-and-the-indian-health-service-for-american-indians-and-alaska-natives-health-access-and-coverage-report/.

irreparably injured if relief is withheld; (3) an injunction will not substantially harm other parties; and (4) an injunction would further the public interest." *CSX Transp., Inc. v. Williams*, 406 F.3d 667, 670 (D.C.Cir. 2005). The court went on to note that "the test is a flexible one," and that, for example, injunctive relief may be justified "where there is a particularly strong likelihood of success on the merits even if there is a relatively slight showing of irreparable injury." *Id.* (quoting *City Fed Fin. Corp. v. Office of the Thrift Supervision*, 58 F.3d 738, 747 (D.C.Cir. 1995)). *See also Estate of Coll-Monge v. Inner Peace Movement*, 524 F.3d 1341, 1349 (D.C.Cir. 2008).

Here the Tribe can show the likelihood of success on the merits and that its members will suffer immediate, irreparable harm in the absence of relief. Moreover, the relief sought by the Tribe will not burden the Defendants. The Tribe merely seeks to preserve the status quo – preserving the funds designated for the Pine Ridge Service Unit – while litigation on the merits is pending. *See Cobell v. Kempthorne*, 455 F.3d 301, 314 (D.C.Cir. 2006); *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d. 290, 297 (D.C.Cir. 2006) (the purpose of a preliminary injunction is to preserve the relative positions of the parties until a trial on the merits can be held). *See also Stanley v. University of Southern California*, 13 F.3d 1313, 1320 (9th Cir. 1994) (injunction "prohibitory" where it "preserves the status quo"); *Johnson v. Kay*, 860 F.2d 529, 541 (2d Cir. 1988) (interim relief not mandatory where it "actually only required the [Defendant] to do what it should have done earlier"). Even if the interim relief requested here could be construed as mandatory, the Tribe's request meets the "heightened scrutiny" required where, as here, "the facts and law clearly favor the moving party." *See Dahl v. HEM Pharmaceuticals Corp.*, 7 F.3d 1399, 1403 (9th Cir. 1993).

### A. The Balance of Harms Weighs Heavily in the Tribe's Favor

a. The Tribe Will Suffer Immediate, Irreparable Harm if Defendants are Not Enjoined

American Indians and Alaska Natives ("AI/AN") suffer from many diseases in much higher numbers than the U.S. population as a whole, and this is reflected in the Tribe. Nationally, AI/AN causes of death exceed the U.S. rate by:

- 3 times the rate from motor vehicle accidents
- 3.1 times the rate for diabetes
- 4.7 times the rate for liver disease and cirrhosis
- 1.4 times the rate for pneumonia
- 1.6 times the rate for suicide
- 1.9 times the rate attributable to homicide

Exh. D.[2] The IHS website states:

> The American Indian and Alaska Native people have long experienced lower health status when compared with other Americans. Lower life expectancy and the disproportionate disease burden exist perhaps because of inadequate education, disproportionate poverty, discrimination in the delivery of health services, and cultural differences. These are broad quality of life issues rooted in economic adversity and poor social conditions. …
>
> American Indians and Alaska Natives born today have a life expectancy that is 4.2 years less than the U.S. all races population (73.7 years to 78.17 years, respectively).
>
> American Indians and Alaska Natives continue to die at higher rates than other Americans in many categories, including chronic liver disease and cirrhosis, diabetes mellitus, unintentional injuries, assault/homicide, intentional self-harm/suicide, and chronic lower respiratory diseases.

Exh. E. *See* 25 U.S.C. § 1601 (5) (finding that "the unmet health needs of the American Indian people are severe and the health status of the Indians is far below that of the general population of the United States.").

---

[2] Exhibit D is excerpted from National Data: *Trends in Indian Health 2014 Edition*, IHS, available online at https://www.ihs.gov/dps/includes/themes/newihstheme/display_objects/documents/Trends2014Book508.pdf.

4

The disparities are even greater on the Tribe's Pine Ridge Indian Reservation, served by the Pine Ridge Service Unit. When Defendant McSwain testified before Congress on Indian teen suicide just last month, he acknowledged that the Tribe is facing "a suicide cluster." Exh. F at 2.

A recent paper concerning health care and health conditions on the Pine Ridge reservation stated:

> [T]he Lakota people of Pine Ridge are faced with some of the worst health disparities in the U.S., including extremely low life expectancies. Many households are affected by chronic ill health such as heart disease, diabetes, cancer, alcoholism, chronic respiratory illness, weight problems, automobile accidents, and other accidents and injuries. … As the Lakota on Pine Ridge are one of the poorest nations in the U.S., their socioeconomic status prevents Lakota people from purchasing health insurance plans or affording out of pocket health expenses.

Exh. G at 18.

Notwithstanding the poor health conditions at Pine Ridge, IHS now plans to take over $1.6 million in third-party collections from the Pine Ridge Service Unit to pay the settlement of overtime claims. The results would be "devastating," in the words of the Acting Clinical Director for the Pine Ridge Hospital, Dr. Patrick Weber. According to Dr. Weber:

> If this action actually stands, it will have a devastating result on our Service Unit. We are ALREADY having a very difficult time maintaining our clinical services. The suicide epidemic and our new clinic in Martin are taking their toll financially. We have no additional funding for these added services and so far no reimbursement for Martin yet due to that clinic not being Medicaid certified. We will have to discuss either reducing services as soon as next month. The added reduction in our budget from this settlement could start a chain reaction that could effect our readiness to maintain CMS accreditation.

Exh. C at 2. *See also id.* at 3 (Acting CEO states that loss of funds will "affect patient care dramatically.").

Absent a restraining order preventing the Defendants from undermining the Tribe's ability to operate governmental programs, the Tribe and its members will suffer immediate and

irreparable harm due to service cuts. These harms cannot be remedied by money damages. In short, "the interests at stake are not merely economic interests in [an administrative scheme], but personal interests in life and health." *Cobell v. Norton*, 240 F.3d 1081, 1097 (D.C. Cir. 2001) (quoting *Public Citizen Health Research Group v. Auchter*, 702 F.2d 1150, 1156 (D.C.Cir.1983) (citation omitted)).

    b. Defendants Will Not Suffer Harm if a Temporary Restraining Order and Preliminary Injunction are Granted

In contrast to the significant, irreparable injury that the Tribe and its members would suffer, Defendants would not suffer any injury as a result of a temporary restraining order or an injunction. The balance of harm thus tips sharply in the Tribe's favor. Restraining the Defendants by requiring them to preserve the funds, pending resolution of this case, does not burden them in any manner. An order will not require the Defendants to provide any additional funding to the service unit. *See Wilson v. Watt*, 703 F.2d 395, 399 (9th Cir. 1983) (balance of hardships tips "sharply" in favor of Alaska Natives for whom a General Assistance program was being terminated by Federal defendants, since the funds to be used were already appropriated and were unspent). Defendants can find and reprogram other funds to pay the settlement, or use the Judgment Fund,[3] or seek a special appropriation.

    B. The Tribe is Likely to Succeed on the Merits

The Tribe is likely to succeed on the merits that the Defendants' plan to use Pine Ridge Service Unit funds to pay the overtime settlement is in violation of the Indian Health Care Improvement Act ("IHCIA"). 25 U.S.C. §§ 1601-1680v. The IHCIA "was enacted 'to implement the Federal responsibility for the care and education of the Indian people by improving the services and facilities of Federal Indian health programs and encouraging

---

[3] The Judgment Fund is available to pay settlements as well as judgments. 31 U.S.C. 1304(a).

maximum participation of Indians in such programs.'" (Exh. F at 3) (Defendant McSwain, quoting the preamble to Public Law 94-437).

Section 401 of IHCIA limits the use of third-party collections from Medicaid and Medicare. That section provides in relevant part:

> (A) 100 percent pass-through of payments due to facilities
>
>> Notwithstanding any other provision of law, ... payments to which a facility of the Service is entitled by reason of a provision of title XVIII [Medicare] or XIX [Medicaid] of the Social Security Act [42 U.S.C. 1395 et seq., 1396 et seq.] shall be placed in a special fund to be held by the Secretary. In making payments from such fund, <u>the Secretary shall ensure that each Service unit of the Service receives 100 percent of the amount to which the facilities of the Service, for which such Service unit makes collections</u>, are entitled by reason of a provision of either such title.

(B) Use of funds

> Amounts received by a facility of the Service under subparagraph (A) by reason of a provision of title XVIII or XIX of the Social Security Act shall first be used ... for the purpose of making any improvements in the programs of the Service operated by or through such facility which may be necessary to achieve or maintain compliance with the applicable conditions and requirements of such respective title. Any amounts so received that are in excess of the amount necessary to achieve or maintain such conditions and requirements shall, subject to consultation with the Indian tribes being served by the Service unit, be used for reducing the health resource deficiencies (as determined in section 1621(c) of this title) of such Indian tribes, including the provision of services pursuant to section 1621d of this title.

25 U.S.C. § 1641(c)(1)(A)&(B) (emphasis added).

The statute requires that third party collections made by a service unit (1) be retained by the service unit, and (2) be used by the service unit for specific purposes. First, the monies shall be used "to achieve or maintain compliance with the applicable conditions and requirements" of the Medicaid and Medicare programs. If the amounts collected are "in excess of the amount necessary to achieve or maintain such conditions and requirements," then they may be used, "subject to consultation with the Indian tribes being served by the Service unit..., for reducing

7

the health resource deficiencies (as determined in section 1621(c) of this title) of such Indian tribes." Settlement of claims against the agency are not included as a permissible purpose.

In any event, the monies that IHS intends to take from the Pine Ridge service unit are required to make improvements in the Pine Ridge Service Unit necessary to achieve or maintain compliance with the applicable conditions and requirements of Medicare and Medicaid. As noted above, Pine Ridge Hospital's Clinical Director has stated that "The added reduction in our budget from this settlement could start a chain reaction that could effect our readiness to maintain CMS accreditation." Exh. C at 2. CMS is the acronym for Centers for Medicare and Medicaid Services, an agency within the U.S. Department of Health and Human Services that administers the Medicare and Medicaid programs. *See* https://www.cms.gov/.

Further, to the extent that the collections of the Pine Ridge Service Unit were not necessary to achieve or maintain Medicaid and Medicare compliance, they could then be used be used to reduce health deficiencies at the service unit, but only subject to consultation with the Tribe. Defendant McSwain admits, however, that "Tribes were not consulted about the payment ahead of time." Exh. B at 2.

In any event, even had the Tribe been consulted, the funds could not lawfully be used to pay the settlement, since such payment would not reduce health deficiencies at the service unit. To the contrary, it will exacerbate them, as noted in the emails by the Pine Ridge Hospitals Clinical Director and CEO. Exh. C at 2-3.

    C. <u>Enjoining Defendants Will Also Serve the Public Interest</u>

Granting temporary relief also serves the public interest. A restraining order would halt the Defendant's blatant, unadorned attempt to ignore the basic requirements of the IHCIA and undermine its implementation in a manner that denies the Tribe the substantive and procedural

guarantees provided by IHCIA. It would also promote the public interest by preserving the funds for health services, as required by law. The requested relief would therefore serve the public interest.

### IV. THE TRIBE SHOULD NOT BE REQUIRED TO POST A BOND

The decision whether to impose a bond as a requirement for a TRO is a matter of discretion for the court. *Temple University v. White*, 941 F.2d 201, 219 (3d Cir. 1991) (a strict reading of Fed. R. Civ. Pro. 65 bond requirement may be "inappropriate"); *Federal Prescription Service, Inc. v. American Pharmaceutical Ass'n*, 636 F.2d 755, 759 (D.C. Cir. 1980) (district court may dispense with bond requirement where restraint will do no material damage to the defendant). *See Navajo Health Foundation-Sage Memorial Hospital v. Burwell*, __ F.3d __, 2015 WL 1906107 at *63 (D.N.M. 2015) (exercising court's wide discretion, court required no bond in case brought by tribally-run health facility against IHS); *see also DSE, Inc. v. United States*, 169 F.3d 21, 34 (D.C. Cir. 1999) (upholding posting of bond of only $5,000 'given [plaintiff's] diminutive size and limited financial resources").

As discussed above, the Tribe will suffer irreparable harm if the action is not enjoined, while the Defendants will suffer no harm. Plaintiff Tribe is also one of the poorest tribes in the nation. Exh. G at 18. A bond should not be required.

## V. Conclusion

The Tribe is entitled to a temporary restraining order to require the Defendants to preserve the funds pending hearing on a preliminary injunction and further, the Tribe is entitled to a preliminary injunction pending resolution of this case.

Respectfully submitted,

_____
Michael L. Roy (DC Bar No. 411841)
mroy@hobbsstraus.com
Jennifer P. Hughes (DC Bar No. 45832)
jhughes@hobbsstraus.com
Marmaduke D. McCloud (DC Bar No. 497105)
dmcloud@hobbsstraus.com
Hobbs, Straus, Dean & Walker, LLP
2120 L Street NW, Suite 700
Washington, DC 20037
202-822-8282 (Tel.)
202-296-8834 (Fax)

Attorneys for the Oglala Sioux Tribe

DATED: August 12, 2015