**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| OGLALA SIOUX TRIBE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Civil Action No. 15-1293-JEB |
| | ) | |
| SYLVIA BURWELL, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS' OPPOSITION TO PLAINTIFF'S**
**MOTION FOR TEMPORARY RESTRAINING ORDER**

Defendants, by their undersigned attorneys and pursuant to LCvR 7(b) and the Minute

Order entered by the Court earlier today, hereby respectfully submit the following memorandum

of points and authorities in opposition to plaintiff's motion for a temporary restraining order in

the above-captioned civil action.

**Background**

This matter involves Defendants' decision to allocate $1.6 million in funds appropriated

for the Pine Ridge Service Unit to pay the Service Unit's estimated portion of salary costs

associated with the Union grievances and the Final Settlement Agreement.

In its request for a temporary restraining order, the Oglala Sioux Tribe (Plaintiff or Tribe)

seeks to enjoin Defendants from using third party insurance recoveries to pay salary costs

already incurred by federal employees to provide health care services to members of the Oglala

Sioux Tribe and other Indian Health Service (IHS) (hereafter referred to as the "Agency")

beneficiaries.  The salary costs are included under  Final Settlement Agreement and required to

be paid pursuant to an agreement reached between the Department of Health and Human

1

Services, IHS, and the Laborers' International Union of North America (LIUNA) for itself and on behalf of the LIUNA IHS National Council, Laborers' Locals 205, 888, 1376, 1386 & 1396, the National Federation of Federal Employees (NFFE) on behalf of NFFE IHS Council and the American Federation of Government Employees Local 3601 AFL-CIO (AFGE) (hereafter collectively referred to as the "Union").

The Final Settlement Agreement, a copy of which is submitted herewith as Exhibit A, resolves grievances filed under the Fair Labor Standards Act of 1938, as amended (hereafter referred to as "the Act" or "FLSA"), which provides minimum standards for both wages and overtime entitlements, and administrative procedures by which covered worktime must be compensated.  Under 29 U.S.C. § 216, an employer who violates the pay provisions "shall be liable to the employee or employees affected in the amount of their unpaid minimum wages, or their unpaid overtime compensation, as the case may be, and in an additional equal amount as liquidated damages." 29 U.S.C. § 216(b). In order to avoid liquidated damages, an employer must show "to the satisfaction of the court that the act or omission giving rise to such action was in good faith and that [it] had reasonable grounds for believing that [the] act or omission was not a violation" of the FLSA. 29 U.S.C. § 260.

On March 26, 2008, NFFE, on behalf of NFFE IHS Council, filed an FLSA Overtime Grievance against the Agency. On May 8, 2008, LIUNA, on behalf of five LIUNA Locals (205, 888, 1376, 1386 & 1396), filed thirty-one identical FLSA Overtime Grievances against the Agency on behalf of as many bargaining units. On June 16, 2008, AFGE Local 3601 filed an identical FLSA Overtime Grievance against the Agency. These grievances (collectively, "FLSA Overtime Grievances") alleged violations of the FLSA on behalf of all covered bargaining unit positions and employees at the Agency represented by the Union. The timeframes covered by the

2

FLSA Overtime Grievances began three years prior to the filing of each up through the Effective

Date of the Final Settlement Agreement.

As specified in the Final Settlement Agreement, IHS agreed with the Union to provide

"Sixty Million Dollars and no cents ($60,000,000.00) for back pay and all related taxes." IHS

also agreed to pay "Twenty Million Dollars and no cents ($20,000,000.00) for attorney fees,

costs and Implementation/Distribution costs and any element of damages raised in the FLSA

Overtime Grievances. . . ."  As noted in letters from HIS submitted as Exhibits A and B to

Plaintiff's Motion, no portion of third party revenue is being used to pay the Twenty Million

Dollar settlement award.  Regardless of whether such funds could be used for the damage award,

third party revenue is only being used to pay for the salary costs approved pursuant the Final

Settlement Agreement.  Specifically, the costs covered by the Sixty Million Dollars include "(a)

unpaid entitlement to overtime, including "capped" overtime claims; (b) unpaid entitlement to

compensatory time; (c) unpaid entitlement to credit time, including "capped" credit time claims;

(d) unpaid entitlement to 'suffered or permitted' overtime as defined by the FLSA; (e) unpaid

entitlement to travel time overtime; (f) unpaid entitlement to training time overtime; (g) unpaid

entitlement to standby pay or on-call pay overtime; (h) the Agency's share of any employer

obligations arising under FICA or any emoluments for payments made to employees as a result

of the Final Settlement Agreement." The Final Settlement Agreement specifies that the amount

shall be paid into escrow in full no later than August 14, 2015.

## Legal Standards

The criteria that govern the issuance of interim injunctive relief in the District of Columbia Circuit are well-settled.  In order for the Court to grant such relief, the plaintiff must show: (1) a strong likelihood of prevailing on the merits of its claim; (2) that it will suffer irreparable harm in the absence of an interim injunction; (3) that, balancing hardships, the issuance of an injunction will not substantially harm other interested parties; and (4) that the public interest favors the requested relief.  *Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985); *Virginia Petroleum Jobbers Ass'n v. FPC*, 259 F.2d 921, 925 (D.C. Cir. 1958) (per curiam); *Washington Metropolitan Area Transportation Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 843-44 (D.C. Cir. 1977).

## Plaintiff Is Not Entitled To A Temporary Restraining Order

Plaintiff is not entitled to a temporary restraining order under the foregoing legal standards.  Not only has plaintiff failed to demonstrate a substantial likelihood of success on the merits, plaintiff has also failed to show the existence of any irreparable harm or that granting interim injunctive relief will serve the public interest and not harm other parties.

### A.      Likelihood of Success

The decision to allocate the funds at issue is "committed to agency discretion by law" and unreviewable under the jurisdictional scheme set forth by Plaintiff.  Consequently, the Court lacks the authority to enjoin IHS from fulfilling its obligations under the Final Settlement Agreement.

IHS receives yearly lump-sum appropriations from Congress and expends the funds under the authority of the Snyder Act, 25 U.S.C. § 13, and the Indian Health Care Improvement

Act, 25 U.S.C. § 1601 *et seq*.  The Snyder Act authorizes IHS to "expend such moneys as

Congress may from time to time appropriate, for the benefit, care, and assistance of the Indians,"

for the "relief of distress and conservation of health."  25 U.S.C. § 13.

In *Lincoln v. Vigil*, 508 U.S. 182 (1993), the Supreme Court held that because IHS

funding emanates from a lump-sum appropriation, IHS funding decisions are generally

committed to agency discretion.  In *Vigil*, several IHS beneficiaries challenged IHS's decision to

reallocate resources from a regional program for handicapped Indian children to a nationwide

effort to assist such children.  *Id.* at 184.  The Supreme Court held IHS's reallocation was

unreviewable because IHS receives its funding through a lump-sum appropriation.  *Id*. at 192-93.

The *Vigil* Court explained that:

> an agency's allocation of funds from a lump-sum appropriation
> requires "a complicated balancing of a number of factors which are
> peculiarly within its expertise": whether its "resources are best
> spent" on one program or another; whether it "is likely to succeed"
> in fulfilling its statutory mandate; whether a particular program
> "best fits the agency's overall policies"; and, "indeed, whether the
> agency has enough resources" to fund a program "at all."  *Heckler
> [v. Chaney]*, 470 U.S. at 831[, 105 S.Ct. at 1655].  As in *Heckler*,
> so here, the "agency is far better equipped than the courts to deal
> with the many variables involved in the proper ordering of its
> priorities."  *Id.*, at 831-832[, 105 S.Ct., at 1656].

*Id.* at 193.  The Court further explained that "the very point of a lump-sum appropriation is to

give an agency the capacity to adapt to changing circumstances and to meet its statutory

responsibilities in what it sees as the most effective or desirable way."  *Id*. at 192.  In carrying

out its statutory missions, IHS must take into account a wide variety of factors, many of which a

court is ill-equipped to consider, and all of which add to the complexity of the allocation decision

Plaintiff asks this Court to enjoin.  As a consequence, IHS's allocation decisions are committed

to agency discretion as a matter of law and unreviewable, as set forth in § 701(a)(2) of the

Administrative Procedure Act.  5 U.S.C. § 701(a)(2).

This principle has no less force simply because the funds in question are third party

reimbursements.  The reimbursements themselves are credited to the very same appropriation.

Although the third party funds are made available for certain purposes, the allocation of such

funds for permissible purposes remains committed to agency discretion.  *See Salazar v. Ramah*

*Navajo Chapter*, 132 S. Ct. 2181, 2190 (2012) (holding that within specified constraints, such

discretion is retained). Moreover, this court has recently rejected the contention that Tribes have

a legal claim to funds IHS distributes from its general appropriation (to which third party

resources are credited), specifically noting that any interest:

> is simply a practical concern on the part of the tribes over what happens to funds
> they might receive, not a legal claim to those funds . . . IHS has discretion to
> allocate its funding as it sees fit. *See Lincoln v. Vigil*, 508 U.S. 182, 193, 113 S.Ct.
> 2024, 124 L.Ed.2d 101 (1993). That discretion, however, is inconsistent with the
> contention that the tribes have a legal claim to the funds IHS distributes from its
> general appropriation. *See id*. at 193, 113 S.Ct. 2024 (holding that courts have no
> authority to oversee the allocation of funds from IHS's lump sum appropriation).

*Pyramid Lake Paiute Tribe v. Burwell*, 70 F. Supp. 3d 534, 541 (D.D.C. 2014).  Here, the IHS

allocated resources within the constraints imposed by Congress and, as such, its allocation

decision is unreviewable.

Under 25 U.S.C. § 1621f, IHS may retain third-party reimbursements, including

Medicare and Medicaid payments, rather than requiring such reimbursements to be credited as

miscellaneous receipts. 25 U.S.C. § 1621f.  Instead, section 1621f directs IHS to use recoveries

in accordance with 25 U.S.C. § 1641, which states:

> Amounts received by a facility of the Service …by reason of a provision of title
> XVIII or XIX of the Social Security Act shall first be used (to such extent or in
> such amounts as are provided in appropriation Acts) for the purpose of making

any improvements in the programs of the Service operated by or through such facility which may be necessary to achieve or maintain compliance with the applicable conditions and requirements of such respective title.  Any amounts so received that are in excess . . . shall . . . be used for reducing the health resource deficiencies . . . .

The proviso "to such extent or in such amounts as are provided in appropriation Acts" reflects that Congress may direct IHS to expend Medicare and Medicaid receipts to make improvements to achieve compliance with those programs.  Congress has historically exercised this authority by prohibiting IHS from using Medicare and Medicaid receipts to fund new facilities construction in lieu of making improvements but otherwise has reaffirmed IHS's authority to retain and expend such collections without expiration.  *See e.g. Consolidated Appropriations Act*, 2008, Pub. L. No. 110-161, 121 Stat. 1844, 2135 ("That the amounts collected by the Secretary of Health and Human Services under the authority of title IV of the Indian Health Care Improvement Act shall remain available until expended for the purpose of achieving compliance with the applicable conditions and requirements of titles XVIII and XIX of the Social Security Act (exclusive of planning, design, or construction of new facilities).").

Unless recoveries are expended to maintain compliance with conditions of participation for Medicare and Medicaid, section 1641(c)(1)(B) provides that the funds shall be used by IHS for reducing health resource deficiencies, "subject to consultation with the Indian tribes being served by the Service unit . . . ." 25 U.S.C. § 1641(c)(1)(B).  In this case, IHS intends to make payments for salary costs, consistent with meeting conditions of participation in Medicare and Medicaid.  Moreover, IHS has consulted.  Indeed, the two "Dear Tribal Leader" letters submitted by Plaintiff are recognized as a form of consultation under IHS's consultation policy.  "The IHS frequently uses a "Dear Tribal Leader Letter" to notify individual Indian Tribes of consultation activities." IHS Consultation Policy (available online at:

7

http://www.ihs.gov/IHM/index.cfm?module=dsp_ihm_circ_main&circ=ihm_circ_0601 ).  In this case, Tribes were not consulted prior to finalizing the Final Settlement Agreement because the settlement arose from a group grievance filed by the union.  Information about employee grievances is generally an internal agency matter and the agency does not disclose such information without consent of the grieving party.  IHS communicated with Tribes and offered an opportunity to comment and ask questions as soon as it was practicable to do so.

The Court should also note that section 1641 was enacted on March 23, 2010, pursuant to section 10221 of the Patient Protection and Affordable Care Act, Pub. L. No. 111-148.  While Service Units are to be credited with their own collections under sections 1621f and 1641, as amended, to the extent any funds at issue were collected before 2010 and are being used to settle personnel costs incurred prior to 2010, section 1641 would not necessarily be the operative authority.  Under prior law, which was codified at 25 U.S.C. §§ 1621f and 1642, the Agency was only required to ensure that Service Units receive 80% of their own collections, and that limitation only applied with respect to Medicaid collections, as follows:

> [T]he Secretary shall ensure that each service unit of the Service receives at least 80 percent of the amounts to which the facilities of the Service, for which such service unit makes collections, are entitled by reason of section 1911 of the Social Security Act.

25 U.S.C. § 1642 (2009).

Nonetheless, there is no merit to Plaintiff's contention that "[s]ettlement of claims against the agency are not included as a permissible purpose" under the authorities referenced herein and in Plaintiff's Motion.  As set forth in the Final Settlement Agreement and the two "Dear Tribal Leader" letters, the Agency is using the third party funds to pay salary costs for services that have already been provided.  Employing and paying personnel are key expenditures in achieving compliance with conditions applicable to participation in the Medicare and Medicaid programs.

Indeed, IHS routinely reports to Congress that payment of personnel costs is the primary use of third party funds, including Medicaid, Medicare, and private insurance collections. The FY 2009 Congressional Justification reported that IHS spent or expected to spend nearly one billion dollars in third party reimbursements on personnel benefits and compensation for FYs 2007-2009 .  *See* FY 2009 Congressional Justification (available online at

http://www.ihs.gov/budgetformulation/includes/themes/newihstheme/documents/FY2009Budget

Justification.pdf).  The Pine Ridge Service Unit currently funds dozens of staff positions using third party resources.

Furthermore, IHS has implemented an assessment structure and reconciliation process for the back pay that is intended to ensure that collections from each Service Unit, including Pine Ridge, will be used to pay personnel costs incurred by that Service Unit. The union will provide quarterly reports to the IHS of actual payments to claimants, which will be used to adjust the initial estimated amounts contributed by each service unit to ensure each IHS service unit, Area Office, and Headquarters is charged as appropriate.  In other words, the Pine Ridge Service Unit is paying for services previously provided and costs already incurred at the Pine Ridge Service Unit.  Consequently, the Pine Ridge Service Unit is appropriately benefitting from its own collections.  Therefore, the funds assessed to the Pine Ridge Service Unit are in fact reducing a health resource deficiency.  IHS has acknowledged that back pay is owed for health services previously rendered at the Pine Ridge Service Unit.  The financial obligation incurred by IHS for the provision of services already provided has triggered a resource deficiency and, accordingly, IHS is appropriately using Pine Ridge Service Unit third party funds to address it.

**B.     Irreparable Injury**

Plaintiff also fails to demonstrate that it will suffer irreparable harm if an injunction is not issued.  In this regard, any alleged injury that purportedly will result "must be both certain and great; it must be actual and not theoretical."  *Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985).  The moving party must show that "[t]he injury complained of [is] of such imminence that there is a clear and present need for equitable relief to prevent irreparable harm." *Id.* (internal quote omitted).

By contrast, Plaintiff references statistics about health conditions affecting Native Americans generally, various health disparities faced by the Lakota people of Pine Ridge, and speculative assertions about how the contemplated funding allocation may affect medical services for Pine Ridge (*e.g.*, "The added reduction in our budget from this settlement *could* start a chain reaction that *could* effect [sic] our readiness to maintain CMS accreditation." [emphasis added]).  Nothing Plaintiff has submitted satisfies the demanding standard for irreparable harm established by the Court of Appeals in *Wisconsin Gas*.

**C.     Harm to Other Parties**

Contrary to Plaintiff's assertions, other parties will sustain substantial harm if the Court issues a temporary restraining order.  In particular, Defendants will be unable to fulfill their obligations to the Union under the Final Settlement Agreement.  This substantial and concrete injury makes the balance of harms tip decidedly against the interim injunctive relief requested by Plaintiff.

**D.     The Public Interest**

The public interest in implementing the Final Settlement Agreement between Defendants' and the Union weighs heavily against issuance of a temporary restraining order.

**Conclusion**

Based on the foregoing, Plaintiff's motion for a temporary restraining order should be denied.  A proposed Order is attached.


Respectfully submitted,

VINCENT H. COHEN, JR., D.C. Bar # 471489
Acting United States Attorney
for the District of Columbia

DANIEL F. VAN HORN, D.C. Bar #924092
Chief, Civil Division

By:  ___/s/ Wyneva Johnson_____
WYNEVA JOHNSON, D.C. BAR #278515
Assistant United States Attorney
555 4th Street, NW
Washington, DC 20530
(202) 252-2518
Wyneva.johnson@usdoj.gov

Attorneys for Defendant


Of Counsel:
SEAN DOOLEY
Department of Health and Human Services
Indian Health Service